UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY SMITH,<br><br>        Plaintiff,<br><br>  v.<br><br><br>C. SCHUYLER, et al.,<br><br>        Defendants. | Case No. 23-cv-03864-JSC<br><br>**ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT BY DEFENDANTS DOHERTY AND BERGEN; DENYING MOTION FOR APPOINTMENT OF COUNSEL; GRANTING EXTENSION OF TIME**<br><br>Re: Dkt. Nos. 33, 38, 57 |

**INTRODUCTION**

Plaintiff, a California prisoner proceeding without attorney representation, filed this civil rights complaint under 42 U.S.C. § 1983. The operative complaint is the amended complaint (ECF No. 15) in which he claims doctors at Salinas Valley State Prison ("SVP") and Natividad Medical Center ("NMC") failed to provide him adequate medical care.[1] Defendants filed three separate motions for summary judgment: one by Dr. Jonathan Doherty (ECF No. 33), one by Dr. Kathryn Bergen (ECF No. 38), and one by Drs. Sevaq Kalinjian and Mandeep Singh (ECF No. 39.) Plaintiff filed oppositions to the Doherty and Bergen motions (ECF Nos. 44, 48), and Dr. Doherty and Dr. Bergen filed replies (ECF No. 53, 55). Plaintiff has not filed an opposition to the summary judgment motion by Drs. Kalinjian and Singh, but in a recent motion for appointment of counsel (ECF No. 57), he indicates he was unable to do so due to back surgery.

For the reasons discussed below, the motions for summary judgment by Dr. Doherty and Dr. Bergen are GRANTED. Plaintiff's motion for appointment of counsel is DENIED, but he is granted an extension of time to file an opposition to the summary judgment motion by Drs.

---

[1] Plaintiff is currently incarcerated at Donovon State Prison ("DSP") in San Diego.

Kalinjian and Singh.

**BACKGROUND**

I. Amended Complaint

Plaintiff suffered from osteomyelitis back pain starting in September 2022, for which he received treatment at clinics inside and outside prison. Plaintiff alleges the following facts in his verified amended complaint regarding the medical treatment Dr. Bergen and Dr. Doherty provided him at NMC while he was housed at SVSP. (ECF No. 15.)

On July 5 and 6, 2023, Dr. Bergen was his attending physician at NMC. (*Id.* at 6.) On July 6, she reduced his dosage for two pain medications: from two milligrams of Dilaudid every four hours to one milligram every four hours and from 400 milligrams of Gabapentin three times per day to 100 milligrams three times per day. (*Id.*) He asked her why she did not discuss these changes with him, and she told him she was "not changing it back." (*Id.*) He "never asked Dr. Bergen or [Defendant] Dr. Doherty to give me 4mg Dilaudid" because he was "satisfied" with receiving two milligrams of Dilaudid. (*Id.* at 7.) He removed his I.V. line and asked to go back to prison. (*Id.* at 6.)

Plaintiff returned to NMC at 5:00 p.m. on July 14, 2023, for an infection and abscess in his spine. (*Id.* at 7.) Dr. Doherty was Plaintiff's "admit doctor," and Plaintiff told him he was in "severe pain" and asked for "pain meds." (*Id.*) Dr. Doherty responded that he wanted to get Plaintiff admitted to the hospital first. (*Id.*) Over the next several hours, Plaintiff asked nurses to repeat his request for pain medication to Dr. Doherty, and they told Plaintiff Dr. Doherty "was aware" of the request. (*Id.* at 7.) At 11:30 p.m., Plaintiff "removed [his] I.V. line," but correctional officials asked him to stop so a nurse could do it. (*Id.*) A nurse arrived and asked for permission to "stop the bleeding," but Plaintiff refused and asked to speak to Dr. Doherty. (*Id.*) Dr. Doherty arrived, and Plaintiff told him he was "in a lot of pain" and asked for pain medication again. (*Id.*) Dr. Doherty told Plaintiff he was not "ordering any pain meds." (*Id.* at 7-8.) Dr. Doherty further told Plaintiff if he "wanted pain meds . . . to go back to prison to get them." (*Id.* at

2

8.)² Plaintiff then asked to be returned to prison.  (*Id.*)

In a recent verified motion for appointment of counsel, Plaintiff states he received spinal fusion surgery on July 14, 2024, at Paradise Valley Medical Center, in which infected discs were removed and plates and screws were implanted in his spine and tailbone.  (ECF No. 57 at 2.)  He was discharged the next day because he did "not get along" with a doctor there who reduced his pain medication in half.  (*Id.*)

## II.  Evidence Submitted by Defendant Dr. Bergen

Plaintiff's medical records show he arrived at NMC's emergency department from SVSP on June 29, 2023, for evaluation of worsening lumbar back pain to a level of 8/10.  (ECF No. 38-3 at 11.)  He was treated by non-defendant doctors who noted he had had surgery to remove an epidural abscess in September 2022 and had been experiencing "numbness, tingling and pain" since March 2023 when he was taken off of IV antibiotics.  (*Id.*)  He received an M.R.I. with results "consistent with residual discitis [/osteomyelitis]," and he was admitted to NMC.  (*Id.* at 74-75.)  Dr. Patberg³ concluded further testing was necessary to determine whether surgery or another course of antibiotics was the proper treatment.  (*Id.* at 27-28.)  Plaintiff received the following medication for his pain: Lidocaine patches, Tylenol, 400 milligrams of Gabapentin three times per day, and two milligrams of Dilaudid every four hours.⁴  (*Id.* at 28; *see also id.* at 48-67.)  On July 4, 2023, Plaintiff told his NMC doctor (who is not a defendant) he pulled out his I.V. the night before because he did not receive the Dilaudid on time; both Plaintiff and a prison guard requested Plaintiff receive Dilaudid on a schedule rather than as needed, which request was denied.  (*Id.* at 41.)  The doctor noted Plaintiff's antibiotics course showed "inflammatory markers trending down."  (*Id.* at 44.)

Defendant Dr. Bergen submitted a declaration stating she treated Plaintiff at NMC on July 5 and 6, 2023.  (ECF No. 38-5 at 1:19-20.)  On July 5, she examined Plaintiff and reviewed his

---

² Dr. Doherty was also Plaintiff's "admit doctor" at NMC on June 6-8, 2023, but Plaintiff does not claim Dr. Doherty provided inadequate care on those dates.  (*Id.* at 8.)
³ The claims against Dr. Patberg were dismissed after Plaintiff did not include him in his amended complaint.  (ECF No. 19.)
⁴ The medical records indicate Dr. Patberg denied Plaintiff's request for four milligrams of Dilaudid every four hours.  (ECF No. 38-3 at 28.)

medical records, where she saw he had previously pulled out his I.V. because he objected to receiving Dilaudid late and not on a schedule. (*Id.* at 1:22-2:2.) He reported to her his pain was "greatly improved," and he had no fever, normal vital signs and lab results, and "mild" warmth in his lower back. (*Id.* at 2:4-6.) She decided to reduce Plaintiff's Dilaudid dosage "based on the totality of circumstances, including the length of time he had been on the pain medication, the other pain medications Plaintiff was already receiving, his endorsement of his pain being 'greatly improved,' my physical examination [eliciting no pain], and his reassuring labs." (*Id.* at 2:18-21.) She did not "believe" or "perceive" Plaintiff had "a serious medical need or issue that urgently or immediately needed to be addressed." (*Id.* at 2:23-25.) Based upon the information she had and her "medical decision making," she concluded "the best course of action" was to wean Plaintiff "off of the I.V. pain medication [(Dilaudid)]" and begin "prescribing oral Norco to help with that transition process." (*Id.* at 2:25-27, 3:3-4.) Following her "typical custom," she "would have" explained this to Plaintiff. (*Id.* at 2:7-12.)

Dr. Bergen attests the next day, she decreased his Dilaudid prescription to one milligram every four hours, and Plaintiff asked her to increase it to four milligrams every four hours. (*Id.* at 3:5-6.) She denied this increase because it was not "medically indicated." (*Id.* at 3:12-13.) She concluded Norco with Dilaudid "for breakthrough pain" was "reasonable under the circumstances" because Plaintiff "did not appear" to have pain when she examined him and he "had walked with physical therapy." (*Id.* at 3:7-9.) When Dr. Bergen last saw Plaintiff on July 6, he was "ripping out his I.V." while "sitting up in bed," and he "did not appear to be in pain." (*Id.* at 9-11.) Plaintiff decided to leave NMC, and Dr. Bergen recommended Plaintiff continue his antibiotics for an additional six weeks. (ECF No. 38-3 at 22-23.)

Dr. Bergen also submits a declaration by Dr. Sumant Ranji, a licensed physician rendering the following opinions regarding Plaintiff's medical needs and Dr. Bergen's medical treatment based on "his background, training and experience, as well as my review of the following materials: the First Amended Complaint (with any exhibits), Plaintiff's medical records from Natividad Medical Center, the declaration of Dr. Bergen and Plaintiff's deposition transcript." (ECF No. 38-6 at 1, 9.):

4

> Based on my review of the materials, it is my opinion that a serious medical condition did not exist at the time Dr. Bergen saw Plaintiff on both July 5 and 6, 2023. In this regard, when Dr. Bergen saw Plaintiff on July 5, 2023, he had already been in the hospital for approximately 6 days and had been receiving antibiotics and pain medication. His blood and wound cultures were all negative (suggesting no infection) and his labs, physical examination and oral history were all within normal limits. Given that Plaintiff had been receiving adequate pain control medication (Lidocaine patches, Tylenol, Dilaudid and Gabapentin), it was completely appropriate to begin decreasing his pain medication with the goal of weaning him off before discharge if possible.
>
> …
>
> Based on a review of the records, it is my opinion that Plaintiff was exhibiting behavior consistent with misuse of pain medication. In this regard, on July 4, 2023 when Plaintiff was seen by Dr. Balkhaa, he had pulled out his IVs the night before because he did not get his pain medications on time. He demanded that the pain medication be given on a schedule as opposed to an as needed basis. On July 6, 2023, when Plaintiff saw Dr. Bergen, he demanded to receive Dilaudid 4mg IV which was twice the initial dose he was receiving. When Dr. Bergen assumingly declined that demand, Plaintiff again ripped out his IVs and this time demanded to be returned to prison. When Plaintiff returned to the ED on July 14, 2023, he again became upset that he was not given pain medication and left the hospital AMA [(against medical advice)].
>
> These actions are suggestive of pain medication misuse and not the actions of a patient who is/was experiencing a serious medical issue. Prescription medication misuse is a very common problem in patient care.
>
> …
>
> [I]t is my opinion, to a reasonable degree of medical certainty, nothing Dr. Bergen did or did not do was the cause of any alleged injury or damage of Plaintiff. Plaintiff himself also testified that he did not suffer any injury as a result of the decrease in medication. (Plaintiff Deposition, 95:24-96:1) It is also my opinion that Dr. Bergen's decision to decrease Plaintiff's IV Dilaudid, when she did, and her decision to transition to oral Norco, complied with the standard of care. Finally, it is my opinion that when Dr. Bergen saw Plaintiff on July 5 and 6, 2023, Plaintiff did not have a serious medical need which required immediate or emergent attention, nor did Dr. Bergen do anything that I would consider deliberately indifferent to a serious medical need.

(*Id.* 6, 8, 9.)  Dr. Ranji also explained:

> IV pain medication is typically administered when oral pain medication is not tolerated, oral pain medication is inadequate to meet the patient's pain needs, or where immediate relief is required. Because of the nature of IV pain medication, the patient will receive

5

> immediate relief; however, it will wear off faster than oral pain medication. There are also more side effects with IV pain medication and it can be more addictive. Where a patient is administered IV pain medication, the goal is always to transition the patient to oral pain medication, especially where the patient's pain is chronic as opposed to acute.
>
> Where a patient has chronic pain (which Plaintiff appeared to have in this case), a multimodal approach is typically best implemented to treat the patient's pain. Here, Plaintiff was receiving Lidocaine patches, Gabapentin, Tylenol, Dilaudid and eventually Norco which was more than adequate given his pain complaints. When Dr. Bergen decided to begin weaning Plaintiff off of the IV Dilaudid, she did not just simply discontinue it all together, but rather decreased the dosage and also introduced oral Norco to help with the transition. This clearly showed that Dr. Bergen was considerate to Plaintiff's pain needs, had a plan to address them, and instituted that plan. The goal appeared to be to wean Plaintiff from the IV pain medication and bridge that with the oral Norco. In order to discharge Plaintiff from the hospital, his pain needed to be adequately controlled, at least with oral pain medication. Practically speaking, if Plaintiff was dependent on IV pain control, he obviously could not be discharged. Plaintiff himself agreed that the IV Dilaudid would eventually need to be decreased. (Plaintiff Deposition, 71:1-15) … At the time Dr. Bergen began transitioning Plaintiff off IV pain medication, a serious medical need did not exist.

(*Id.* at 7.)

III. Evidence submitted by Defendant Dr. Doherty

Dr. Doherty submits a declaration stating he examined Plaintiff in the NMC Emergency Department at 6:05 p.m. on July 14, 2023, for complaints of back pain and injury and for osteomyelitis.[5] (ECF No. 33-3 at 2:22-23; *id.* at 9 (medical record showing time Dr. Doherty examined him).) Dr. Doherty reviewed Plaintiff's vital signs, lab results, and records of his prior visits to the Emergency Department on May 24, June 6, and June 8, 2023, and he took a verbal medical history. (*Id.* at 2:24-26.) He concluded Plaintiff was "medically stable, but that inpatient admission for further evaluation and administration of I.V. antibiotics were indicated." (*Id.* at 2:26-28.) He noted "the records of prior admissions raised concern that Mr. Smith was engaging in drug seeking behavior (specifically, for opioid pain medications)." (*Id.* at 2:28-3:2.)

Dr. Doherty attests he planned to admit Plaintiff as an inpatient for "further evaluation"

---

[5] Plaintiff's medical records indicate he had additional symptoms — nausea, vomiting, diarrhea, and night sweats — and Dr. Doherty decided Plaintiff should change his antibiotics and receive them intravenously upon admission to the NMC. (ECF No. 33-3 at 14.)

6

and administration of I.V. antibiotics, but Plaintiff requested Dr. Doherty "immediately prescribe opioid medications.[6]" (*Id.* at 3:3-6.) Dr. Doherty determined in his "professional judgment":

> (1) immediate administration of opioid medications was not appropriate, because Mr. Smith's condition was stable, and that there was reasonable concern for drug seeking behavior for opioid pain medications; and (2) therefore, it would be more appropriate for Mr. Smith to be admitted to the medical unit and evaluated by the inpatient team, who would then determine whether it was appropriate for him to receive opioid pain medications.

(*Id.* at 3:7-12.) Plaintiff subsequently made repeated requests for opioids, which Dr. Doherty viewed as possible "drug seeking behavior." (*Id.* at 3:14-17.) Dr. Doherty returned to Plaintiff's room because Plaintiff was trying to pull out his I.V. line, and Plaintiff "demanded" opioids. (*Id.* at 3:21-24.) Dr. Doherty denied the request, and Plaintiff returned to prison "at his insistence and against medical advice" at 7:20 p.m.. (*Id.* at 3:25-28; 15.)

Dr. Doherty also submits the declaration of Dr. McDermott, a licensed medical doctor who reviewed Plaintiff's medical records and concluded Dr. Doherty's medical care was "medically acceptable," "absolutely did not reflect deliberate indifference," and "complied fully with the standard of care" because:

> The role of an emergency physician is to assess the patient's condition, order medical interventions and medications necessary to stabilize the patient, and (where indicated) arrange for admission and further evaluation and treatment by other physicians. Here, Dr. Doherty reasonably concluded that Plaintiff's condition was stable without administration of opioid pain medications, and that it would be more appropriate for Plaintiff to be admitted and evaluated by the inpatient team before any opioid pain medications were administered to Plaintiff.
>
> When an emergency physician is concerned that the patient may be prone to drug seeking behavior, an emergency physician should be wary of prescribing the patient the medications that are the target of that behavior. Here, Dr. Doherty had ample cause for concern that Mr. Smith was engaging in drug seeking behavior. The records of Mr. Smith's prior presentations to Natividad Medical Center raised concern that Mr. Smith was engaging in drug seeking behavior (specifically, for opioid pain medications). Mr. Smith's repeated demands that Dr. Doherty prescribe opioid pain medications (despite being medically stable without them) were further cause for concern that Mr. Smith was engaging in drug seeking behavior.

---

[6] The parties do not dispute that Dilaudid is an opiate.

7

> Emergency physicians in California are under intense pressure from the Medical Board of California and the American College of Emergency Physicians to exercise caution in prescribing opioid pain medications. For example, the Medical Board of California has adopted very complex and restrictive guidelines and will impose license discipline against physicians that exceed those guidelines. Similarly, the American College of Emergency Physicians has adopted a Clinical Policy that cautions Emergency Physicians to carefully consider the many adverse effects of opioid pain medications (including nausea, constipation, falls, tolerance, physical dependence, sedation, respiratory depression, and death) before prescribing them.
>
> Where the patient's plan of care is to admit the patient for evaluation and further care by the inpatient team, it is reasonable for an emergency physician to defer decisions that are not time sensitive to the inpatient care team.  Here, administration of opioid medications to Mr. Smith was not [] time sensitive, as Mr. Smith's condition was stable without opioid medications.  Therefore, it was appropriate for Dr. Doherty to defer prescription of opioid pain medications to the inpatient care team.

(ECF No. 33-4 at 5:27-7:3, 7:12.)  Dr. McDermott also concluded Dr. Doherty "did not present a risk to Plaintiff's health" because:

> (a) Mr. Smith's condition was stable without administration of opioid pain medications; and (b) Deferring the decision regarding prescription of pain medications to the inpatient team created no risk to Mr. Smith's health

(ECF No. 33-4 at 7:5-8.)

IV.     Plaintiff's Evidence in Opposition

Plaintiff filed a brief opposition to Dr. Doherty's motion for summary judgment.  (ECF No. 44.)  The opposition, which is verified, is two pages and states no facts within Plaintiff's personal knowledge other than the assertion he "was scheduled to have spinal surgery when he was admitted on July 14, 2023." (*Id.* at 2:1-2.)

Plaintiff's opposition to Dr. Bergen's motion is accompanied by a declaration with exhibits, and a verified memorandum.[7]  (ECF Nos. 48, 49, 50.)  Plaintiff complains the nurses at NMC had trouble inserting an IV line when administering the Dilaudid, and he "always" received

---

[7] The opposition to Dr. Bergen's motion is one page and appears to be missing the second page. (*See* ECF No. 48 at 1 (stating "page 1 of 2").)  The Court is satisfied it has nevertheless considered all of Plaintiff's evidence and arguments because his declaration, memorandum, and exhibits, are all complete, as are his verified amended complaint and verified opposition to Dr. Doherty's motion for summary judgment.  (*See* ECF Nos. 15, 44, 49, 50.)

8

1  Dilaudid late, unlike Gabapentin, which he received on time because it was "scheduled." (ECF
2  No. 49 at 1:23-2:10.) He had two correctional officers with him when he was at NMC, and they
3  also requested he receive Dilaudid on a schedule. (*Id.* at 2:11-18.) On July 4, 2023, he removed
4  his I.V. line because a nurse "would not bring my pain med Dilaudid when requested." (ECF No.
5  50 at 2:3-4.)

6        Plaintiff states his pain had "greatly improved" when he first met with Dr. Bergen (on July
7  5, 2023) because he had just received a dose of Dilaudid. (ECF No. 49 at 2:24-26.) Dr. Bergen
8  did not discuss the reduction of his pain medication with him. (*Id.* at 3:2-8; ECF No. 50 at 2:6-7.)
9  Plaintiff denies "ever" asking Dr. Bergen for Dilaudid; he "simply asked Dr. Bergen why had she
10 changed my pain meds without discussing it with me." (ECF No. 49 at 4:15-18.) He states he
11 "never" left NMC against medical advice (*id.* at 1:21-22), but he also states that when Dr. Bergen
12 told him she was not increasing his pain medication on the afternoon of July 6, 2023, he was "fed
13 up," pulled out his I.V., and "requested to be discharged" (*id.* 3:10-14; *see also id.* at 2:2-4
14 ("[A]fter 6 or 8 very painful attempts to insert a I.V. line [Plaintiff] would state 'no more' send me
15 back to prison.")). He states he never asked for a four-milligram dose of Dilaudid from Dr.
16 Bergen or Dr. Doherty, and he denies "drug seeking." (ECF No. 49 at 1:21-23; *see also id.* at 4:1-
17 7, ECF No. 50 at 2:13-18.)

18       Plaintiff states on July 14, 2023, Dr. Doherty "would not order pain meds for me during
19 my over two hours in the E.R.." (ECF No. 50 at 2:20-22.) He states he "never asked Dr. Doherty
20 for Dilaudid." (*Id.* at 2:24.)

**DISCUSSION**

I.   <u>Standard of Review</u>

23       Summary judgment is proper where the pleadings, discovery and affidavits show there is
24 "no genuine issue as to any material fact and that the moving party is entitled to judgment as a
25 matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of
26 the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material
27 fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the
28 nonmoving party. *Id.*

9

1    The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). When the moving party has met this burden of production, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing there is a genuine issue for trial. *Id.* If the nonmoving party fails to produce enough evidence to show a genuine issue of material fact, the moving party wins. *Id*.

At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 570 U.S. 650, 656-57 (2014). If more than one reasonable inference can be drawn from undisputed facts, the trial court must credit the inference in favor of the nonmoving party. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

II. Analysis

1. Plaintiff's Claim

In reviewing the amended complaint under 28 U.S.C. § 1915A, the Court concluded, when liberally construed, it stated a claim against Defendants for violating his Eighth Amendment rights by being deliberately indifferent to his serious medical needs.

2. Eighth Amendment Standard

"Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on such a claim, a prisoner-plaintiff must show he or she had a "serious medical need" and that the defendants' "response to the need was deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

A prison official is deliberately indifferent if the "official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). An official is liable if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. So, for deliberate indifference to be

established, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. *Simmons v. G. Arnett*, 47 F.4th 927, 933 (9th Cir. 2022). A claim of medical malpractice or negligence does not give rise to a Section 1983 claim. *See Toguchi v. Chung,* 391 F.3d 1051, 1060 (9th Cir. 2004). Neither does a "difference of opinion between a prisoner-patient and prison medical authorities regarding treatment." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a "mere difference of medical opinion" among medical professionals as to the need to pursue one course of treatment over another does not raise a "material question of fact" regarding the issue of deliberate indifference. *Toguchi*, 391 F.3d at 1058. "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was medically unacceptable under the circumstances, and was chosen in conscious disregard of an excessive risk to [the prisoner's] health." *Id.* (citation and internal quotation marks omitted).

3. Analysis

    a. Doctor Bergen's Motion

Viewing the evidence in a light most favorable to Plaintiff, no reasonable fact-finder could conclude Dr. Bergen was deliberately indifferent to Plaintiff's chronic pain.[8] Plaintiff complains she reduced his Dilaudid dosage, but the evidence does not support a reasonable inference such a reduction disregarded an "excessive risk" to his health or a "substantial risk of harm" to him. *Farmer*, 511 U.S. 837. The evidence is undisputed that when Dr. Bergen met Plaintiff on July 5, 2023, she learned about his medical condition and history by reviewing his medical records — including his test results, his medications, and prior doctors' notes. There is also no dispute he had been at NMC for six days receiving pain medications, his pain had "greatly improved," he did not have pain when touched, he had no fever, and he had normal lab results and only "mild" warmth in his back. (ECF No. 38-3 at 2:2-5.) The next day, when Dr. Bergen reduced his Dilaudid dosage, he did not have pain, and she had seen him walk well with physical therapy.

---

[8] The Court assumes for purposes of summary judgment that his chronic pain is a "serious medical condition" within the meaning of the Eighth Amendment. *See Estelle*, 429 U.S. at 104. Plaintiff does not claim that Dr. Bergen was deliberately indifferent to any other medical condition.

11

There is also undisputed evidence Plaintiff was receiving a host of other pain medication when Dr. Bergen reduced the Dilaudid dosage, including Gabapentin three times a day, Lidocaine patches, Norco, and Tylenol. The evidence is uncontradicted that the "multimodal" approach was a medically appropriate treatment for chronic pain, as was Dr. Bergen's decision to transition Plaintiff from I.V. pain medication (Dilaudid) to oral (Norco) pain medication.[9] (*See* ECF No. 38-6 at 7.) Indeed, Plaintiff testified in his deposition he suffered no injury and "didn't feel no pain" as a result of the reduced Dilaudid dosage. (ECF No. 38-4 at 14:24-15:1.) At most, the record reflects that Plaintiff merely disagrees with Dr. Bergen's opinion as to how to treat his pain. But "[a] difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin*, 662 F.2d at 1344; *see also Hodges v. Corizon Health, Inc.*, 837 F. App'x 466, 468 (9th Cir. 2020) (holding in a prisoner deliberate indifference to medical needs case that the plaintiff's "own lay opinion cannot create a genuine issue of material fact regarding the need for a specific type of medical treatment"); *Davis v. Ramen*, 501 F. App'x 660 (9th Cir. 2012) (affirming summary judgment for defendants on the plaintiff inmate's claim the defendants were deliberately indifferent when they altered the plaintiff's diabetes treatment and discontinued his HIV medication because the difference of opinion between prisoner and medical staff does not support a deliberate indifference claim).

Plaintiff's insistence Dr. Bergen was deliberately indifferent to his serious medical needs because she did not discuss the change in pain medication with him does not create a genuine issue of material fact. Assuming it is true she did not discuss it with him, there is no evidence supporting a reasonable inference this created "an excessive risk" to Plaintiff's health. *See Farmer*, 511 U.S. at 837. Plaintiff may have preferred to have a discussion, but there is no evidence supporting a reasonable inference not having a discussion caused or created any risk of harm or injury to him.

---

[9] Although Plaintiff alleged a reduction of Gabapentin in his amended complaint, he concedes in his deposition Dr. Bergen did not reduce his Gabapentin dosage.. (ECF No. 38-4 at 6:2-8.) This is not a material issue of fact in any event because even if Dr. Bergen had reduced this medication, this would raise no more than a difference of opinion between Plaintiff and Dr. Bergen as to how to properly treat his pain, which under *Franklin* does not give rise to a claim under the Eighth Amendment.

1    Plaintiff also argues Dr. Bergen "discriminated" against prisoners, such as him;
2    specifically, he asserts she "conspired" with Dr. Doherty "to paint Plaintiff as a drug seeking
3    opiate to cover up their discrimination and retaliate against Plaintiff for making complaints"
4    against NMC nurses and doctors.  (ECF No. 50 at 2:25-28.)  Plaintiff has not pled retaliation or
5    equal protection claims insofar as the amended complaint does not make such claims or allege
6    discrimination or retaliation by Dr. Bergen or any of the other Defendants.  To the extent he
7    argues discrimination or retaliation by Dr. Bergen could support an *Eighth Amendment* claim by
8    allowing a reasonable inference that she was deliberately indifferent to his medical needs, there is
9    no evidence of such discrimination or retaliation.  Specifically, as to his assertions of
10   discrimination, there is no evidence showing what medical treatment Dr. Bergen (or Dr. Doherty)
11   provided non-prisoner patients, let alone that non-prisoner patients with similar medical conditions
12   received different (or better) medical care than Plaintiff.  As for his assertion of retaliation, there is
13   no evidence Dr. Bergen (or Dr. Doherty) were aware of any complaints made by Plaintiff about
14   NMC staff, nor any evidence supporting a reasonable inference that her (or Dr. Doherty's) medical
15   decisions were based upon such complaints, as opposed to upon her observations, her medical
16   expertise, and Plaintiff's symptoms and medical needs.  Consequently, there is not triable issue as
17   to whether Dr. Bergen engaged in any discrimination or retaliation.
18    The Court concludes there is no triable factual dispute, if resolved in Plaintiff's favor, that
19   reasonably supports a determination that Dr. Bergen was deliberately indifferent to his serious
20   medical needs.  Consequently, she is entitled to summary judgment.
21            b.       Dr. Doherty's Motion
22    The evidence, when viewed in a light most favorable to Plaintiff, also does not reasonably
23   support a determination that Dr. Doherty was deliberately indifferent to Plaintiff's medical needs.
24   The evidence is undisputed that his responsibility, as an emergency doctor, was simply to stabilize
25   Plaintiff and decide whether he should be admitted.  To that end, he reviewed Plaintiff's medical
26   history and records, examined him, and took his vital signs.  Plaintiff also does not dispute the
27   reasonableness of Dr. Doherty's finding that Plaintiff was stable and should be admitted.  Plaintiff
28   merely complains about Dr. Doherty's decision not to prescribe him "pain meds" before admitting

him.  (ECF No. 15 at 7.)

The record supports a finding Dr. Doherty denied Plaintiff any pain medication.  Dr. Doherty attests he denied Plaintiff "opioids," which Plaintiff requested.  (ECF No. 33-3 at 2-3.) But the medical records of that visit do not show Dr. Doherty prescribed other pain medications (*id.* at 9-15), and Plaintiff asserts Dr. Doherty denied him "pain meds" without specifying what type.  (ECF No. 15 at 7-8; ECF No. 50 at 2.)  But the evidence does not support a reasonable inference that in not ordering Plaintiff pain medication, Dr. Doherty knew of and disregarded a "substantial risk of serious harm" to Plaintiff or an "excessive risk" to his health.  *Farmer*, 511 U.S. at 837, 847.  The evidence is uncontradicted Plaintiff would remain medically stable and did not risk some sort of injury from not receiving pain medication.  (ECF No. 33-4 at 7: ("Deferring the decision regarding prescription of pain medications to the inpatient team created no risk to Mr. Smith's health.").)  Further, it is undisputed Dr. Doherty did not deny Plaintiff pain medication altogether; he decided to admit Plaintiff and deferred the administration of pain medication to the inpatient department, where an I.V. would be started.  (ECF No. 50 (Plaintiff stating, in verified opposition, "Dr. Doherty informed [me] he would order me pain meds once the I.V. line had been placed.").)[10]

Plaintiff argues the medical records upon which Dr. Doherty relied included a "fabracated [sic] story" by Dr. Bergen that he was "demanding" a four-milligram dose of Dilaudid as part of "a conspiracy to cover up [NMC] discrimination against prisoners."  (ECF No. 44 at 1:24-26.) There is no evidence, however, suggesting Dr. Doherty had reason to believe, let alone that he knew, Dr. Bergen lied in Plaintiff's medical records that there was a possibility of drug misuse, or that there was any reason he could not rely on these records.  As for his allegation of discrimination against prisoner-patients, for the reasons discussed above, there is no triable issue as to whether Dr. Doherty engaged in such discrimination.

Plaintiff's assertion in his opposition he "was scheduled to have spinal surgery when he

---

[10] The Court notes the evidence is undisputed Plaintiff was only in Dr. Doherty's care for slightly more than one hour, and at NMC for a total of two hours and twenty minutes: he arrived at the NMC E.R. at 5:00 p.m., Dr. Doherty saw him at 6:02 p.m., and Plaintiff left NMC at 7:20 p.m.. (ECF No. 15 at 7; ECF No. 33-3 at 9, 15.)

14

1  was admitted [to NMC] on July 14, 2023" also does not create a triable issue of fact. (ECF No. 44

2  at 2:1-2:2.) Accepting this fact as true, it does not support a reasonable inference Dr. Doherty was

3  deliberately indifferent. There is no evidence[11] suggesting Dr. Doherty prevented Plaintiff from

4  having surgery or ordered Plaintiff discharged from NMC. To the contrary, the evidence is

5  undisputed Dr. Doherty decided to *admit* Plaintiff to NMC, where he would be prescribed any

6  medically necessary pain medication. Even if, as Plaintiff alleges, Dr. Doherty told Plaintiff he

7  could return to prison to ask for pain medication, this did not prevent Plaintiff from staying at

8  NMC to receive any surgery that was scheduled.

9        The undisputed evidence that Dr. Doherty made a conscious decision to defer prescribing

10  pain medication for Plaintiff until Plaintiff was admitted to the hospital precludes a reasonable

11  fact-finder from determining Dr. Doherty knowingly disregarded a "substantial" or "excessive"

12  risk of harm to Plaintiff. *See Farmer*, 511 U.S. at 837; *see also Franklin*, 662 F.2d at 1344

13  ("difference of opinion between a prisoner-patient and prison medical authorities regarding

14  treatment" cannot support a deliberate indifference claim). Consequently, there is no triable issue

15  that, if resolved in Plaintiff's favor, would reasonably support a determination Dr. Doherty was

16  deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[12] Dr

17  Doherty is entitled to summary judgment on Plaintiff's claim.

18      4. Motion for Appointment of Counsel

19        Plaintiff has filed a motion for appointment of counsel. (ECF No. 57.) This is his third

20  such motion, and he was instructed two prior occasions: "Should referral for location of pro bono

21  counsel become necessary at a later time, the Court will issue a referral order on its own; Plaintiff

22  need and shall not request appointment of counsel in this Court again." (ECF No. 8 at 4; ECF No.

23  54 at 2.) Plaintiff asserts his back pain and a recent back surgery in July 2024 prevented him from

24  filing an opposition to the summary judgment motion by Defendants Drs. Kalinjian and Singh in

25  April 2024 and attending a settlement conference in another case in June 2023. (ECF No. 57 at 1-

---

[11] As noted above, Plaintiff received spinal surgery in July 2024.
[12] The Court does not address Dr. Doherty's argument regarding the state law claim of negligence / medical malpractice because Plaintiff does not make such a claim.

15

2.) These circumstances do not necessitate his representation by an attorney because he has shown he is able to litigate this case while he has been receiving treatment for his condition and has received ample extensions of deadlines as needed. In light of his recent surgery, however, an additional extension of time to file an opposition to the summary judgment motion of Defendants Singh and Kalinjian is granted below.

In his motion, Plaintiff also states he wants to add claims against doctors at Donovon State Prison (where he is currently housed) and Paradise Valley Medical Center, both in San Diego County, for alleged inadequate medical care since the events described in the amended complaint. The time for him to amend his complaint as a matter of course has expired. *See* Fed. R. Civ. P. 15(a). Adding additional claims and defendants at this stage, after the existing defendants have filed dispositive motions, would substantially prolong the resolution of this case. In any event, the proper venue for Plaintiff's proposed claims is the United States District Court for the Southern District of California, where those defendants and the events giving rise to those claims occurred. *See* 28 U.S.C. § 1391(b) (when, as here, jurisdiction is not founded on diversity, venue is proper in the district in which (1) any defendant resides, if all of the defendants reside in the same state, (2) the district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.) Plaintiff may pursue his claims in a new case filed in Southern District of California, but he may not add them to this case in a further amended complaint.

//
//

**CONCLUSION**

For the above reasons, Defendant Dr. Doherty's motion for summary judgment is GRANTED, Defendant Dr. Bergen's motion for summary judgment is GRANTED, and Plaintiff's motion for appointment of counsel is DENIED.  Plaintiff is GRANTED an extension of time, to and including **October 28, 2024**, to file an opposition to the motion for summary judgment filed by Defendants Dr. Singh and Dr. Kalinjian.

This order resolves docket numbers 33, 38, and 57.

**IT IS SO ORDERED.**

Dated: September 27, 2024

JACQUELINE SCOTT CORLEY
United States District Judge

17