UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY SMITH,<br><br>    Plaintiff,<br><br>  v.<br><br>C. SCHUYLER, et al.,<br><br>    Defendants. | Case No. 23-cv-03864-JSC<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS DR. SINGH AND DR. KALINJIAN; DENYING MOTION FOR APPOINTMENT OF COUNSEL**<br><br>Re: Dkt. Nos. 39, 76. |

## INTRODUCTION

Plaintiff, a California prisoner proceeding without attorney representation, filed this civil rights complaint under 42 U.S.C. § 1983. The operative complaint is the amended complaint (ECF No. 15) in which he claims doctors at various prisons and hospitals failed to provide him adequate medical care.[1] The Court previously granted the summary judgment motions by Dr. Jonathan Doherty and Dr. Kathryn Bergen. (ECF No. 60.) Now before the Court is the joint summary judgment motion by Drs. Sevaq Kalinjian and Mandeep Singh. (ECF No. 39.) Plaintiff filed opposition papers (ECF Nos. 67-70), and Drs. Kalinjian and Singh filed a reply. (ECF Nos. 68, 74.) For the reasons discussed below, the motion for summary judgment is GRANTED. Plaintiff's motion for appointment of counsel (ECF No. 76) is DENIED.

## BACKGROUND

I.   <u>Amended Complaint</u>

Plaintiff's verified amended complaint (ECF No. 15) is the operative complaint and alleges the following facts.

In September 2022, when Plaintiff was housed at California State Prison, Sacramento

---

[1] Plaintiff is currently incarcerated at Donovon State Prison ("DSP") in San Diego.

("CSP-SAC"), he experienced "severe" back pain. (ECF No. 15 at 8.) On October 12, 2022, a prison doctor sent him to an external hospital, Methodist Hospital, for an MRI, which showed his "spine was damaged."[2] (*Id.*) The next day, he was transferred to California State Prison, Lancaster ("CSP-LAC"), where he fell down and received a "pain shot." (*Id.*)

Defendant Dr. Kalinjian, a doctor at CSP-LAC, first saw Plaintiff "on or about October 16, 2022." (*Id.*) Plaintiff told him about the MRI from October 12, but Dr. Kalinjian said he did not see a record of an MRI in his medical records. (*Id.*) Dr. Kalinjian did not give Plaintiff a physical exam and accused Plaintiff of "seeking pain meds or transfer." (*Id.*) On October 19, 2022, Plaintiff swallowed a razor blade due to the pain, and he was transferred to Palmdale Regional Medical Center ("Palmdale Hospital"). (*Id.* at 8-9.) There, a doctor (who is not a defendant) ordered Plaintiff a wheelchair, and he also ordered Plaintiff's MRI results from Methodist Hospital. (*Id.* at 9.) The doctor told Plaintiff he would recommend another MRI of Plaintiff's spine. (*Id.*)

In November 2022, Plaintiff saw Dr. Kalinjian again and told him he had "so much pain I couldn't walk" and had lost 61 pounds in three weeks. (*Id.*) Dr. Kalinjian "ignored" the weight loss, and told Plaintiff he was "faking" the inability to walk because he had seen Plaintiff walking recently. (*Id.*) Plaintiff reported the weight loss to his psychiatrist, who sent Plaintiff to a mental health crisis bed. (*Id.*) On December 27, 2022, Dr. Kalinjian ordered another MRI, which showed "a spinal infection [(osteomyelitis)] with a growing abscess the size of [Plaintiff's] fist" and sent "him to an outside hospital for emergency spinal surgery." (*Id.* at 2-3, 9.)

Following his surgery, Plaintiff received intravenous antibiotics until March 2023, and his "severe pain" worsened when the antibiotics stopped. (*Id.* at 3.) He received another MRI on April 27, 2023 at the California Health Care Facility ("CHCF"), where he had been transferred; this MRI showed his spinal infection was returning. (*Id.*)

Plaintiff was transferred to SVSP in May 2023, where Defendant Dr. Singh was his primary care physician. (*Id.* at 2) Plaintiff complained of "intense pain" to Dr. Singh. (*Id.* at 3.)

---

[2] As explained below, the medical records of this exhibit show he received a CT scan, not an MRI. (ECF No. 68 at 22.)

She concluded he was simply seeking stronger drugs improperly, and she reduced his prescription for Tylenol with codeine from three doses per day to two doses per day.  (*Id.*)  On May 31, 2023, she ordered another MRI, that showed the infection returning, and on June 6, 2023, she referred Plaintiff to an outside hospital (Natividad Medical Center ("NMC")) for neurosurgical consultation.  (*Id.*)  Plaintiff was taken to NMC, but he went back to SVSP because attempts to start an intravenous line failed.  (*Id.*)  The next day, June 7, 2023, Dr. Singh tried "to bribe" him to return to NMC using pain medication; on June 8, 2023, she sent correctional officials to extract him from his cell to take him to NMC, but he went willingly.  (*Id.* at 6.)[3]

II.   Defendants' Evidence

    A.   Dr. Kalinjian's Treatment of Plaintiff

Dr. Kalinjian first examined Plaintiff in October 19, 2022,  He reviewed Plaintiff's medical records and learned that a week earlier, Plaintiff had been treated for back pain in the Emergency Department at Methodist Hospital (a hospital near CSP SAC).  (ECF No. 39-11 at ¶ 3.)  Plaintiff received a CT scan of his abdomen and pelvis, a diagnosis that flank pain and constipation were causing his back pain, and a recommendation for an ultrasound for further evaluation of a possible mass on his liver.  (*Id.*)  Dr. Kalinjian ordered immediate x-rays of Plaintiff's abdomen in addition to the ultrasound that had been recommended at the hospital.  (*Id.*)

Within an hour, the x-rays confirmed a 3.7 cm razor blade in Plaintiff's abdomen, and Dr. Kalinjian ordered Plaintiff transferred to the emergency department of an outside hospital (ECF No. 39-23 at 85-88), where he was examined within two hours (*id.* at 94-96).  The emergency department doctor found Plaintiff in stable condition and recommended no treatment other than follow up by his primary care physician in one to two days.  (*Id.*)  The very next day, on October 20, 2022, Dr. Kalinjian saw Plaintiff again, ordered an abdominal ultrasound to monitor the razor, and provided treatment for gastritis.  (ECF No. 39-11 at ¶ 4.)  Dr. Kalinjian examined Plaintiff again on October 27, 2022, for back pain.  (*Id.* at ¶ 5.)  Dr. Kalinjian offered Plaintiff "multiple

---

[3] Over a year later, on July 14, 2024, he underwent a second spinal surgery in a hospital in San Diego in which infected discs were removed and plates and screws were implanted in his spine and tailbone.  (ECF No. 57 at 2.)  Plaintiff was discharged the next day because he did "not get[] along" with a doctor there who reduced his pain medication in half.  (*Id.*)

choices" of pain medication "for management of chronic back pain, such as diclofenac gel, lidocaine patch, Tylenol, NSAIDs, Cymbalta, [and] amitriptyline." (*Id.*; ECF No. 39-23 at 106.) Dr. Kalinjian declined Plaintiff's request for morphine, however, which he explains as follows:

> When Smith asked during this visit why he was not being given morphine, I explained to Smith that morphine would not be the best course of chronic pain management due to the very high risk of dependency. Given Smith's diagnoses of prior methamphetamine use and opioid use disorder, I believed it would not have been prudent to prescribe a narcotic for pain management. Further, Smith was not exhibiting signs of any distress during the visit.

(ECF No. 39-11 at ¶ 5.) Dr. Kalinjian also offered Plaintiff surgery or spinal injections, but Plaintiff stated those would not work. (ECF No. 39-23 at 106.) Dr. Kalinjian referred him to physical therapy and for an MRI, prescribed Tylenol and lidocaine patches "as needed . . . in addition to [Plaintiff's] current diclofenac gel and tablets," allowed him to continue with a wheelchair instead of a walker, and informed him that the CT Scan found no cysts. (*Id.* at 107.) Plaintiff received physical therapy three days later, and the therapist gave him instructions and recommended he return twice per week. (*Id.* at 109-111.)

On Thanksgiving Day, November 24, 2022, Dr. Kalinjian was on-call and received a call from the prison infirmary where Plaintiff was in a mental crisis bed for suicidal ideation. (ECF No. 39-11 at ¶ 6.) Dr. Kalinjian was not "technically" Plaintiff's primary care provider at that time because a different doctor "was working in that area." (*Id.*) On the call, Dr. Kalinjian agreed to grant Plaintiff's request to change his NSAID to diclofenac. (*Id.*) Dr. Kalinjian could "not yet refer" Plaintiff to a neurosurgeon because an MRI had not been completed, and he could not order an MRI because Plaintiff had not been "cleared" of suicidal ideation. (*Id.*)

On December 14, 2022,[4] Dr. Kalinjian treated Plaintiff in response to Plaintiff's request to continue prescriptions for muscle relaxants and gabapentin. (ECF No. 39-11 at ¶ 7.) Dr. Kalinjian declined because gabapentin is not medically indicated for chronic back pain, and Plaintiff did not meet the criteria for gabapentin imposed by the California Department of Corrections and

---

[4] Between November 24, 2022, and December 14, 2022, Plaintiff was not housed in the yard where Dr. Kalinjian worked and so he received medical examinations and treatment for back pain from other non-defendant doctors and medical staff. (*See* ECF No. 39-21 at ¶¶ 30-38.)

4

Rehabilitation.[5] (*Id*.) Plaintiff indicated diclofenac helped, and Dr. Kalinjian noted this NSAID was available to him "as needed." (ECF No. 39-23 at 135.) He offered Plaintiff other pain medications, including duloxetine, increased dose of amitriptyline, and lidocaine patches, but Plaintiff "became upset" and declined. (*Id.* at 136.) Plaintiff "was witnessed" using his wheelchair as a walker, so Dr. Kalinjian offered him a walker instead; Plaintiff said, "Shove it up your ass," and Dr. Kalinjian ordered him a permanent wheelchair. (*Id.* at 135.) Dr. Kalinjian reviewed Plaintiff's medical records, determined he had lost approximately 30 pounds (13.7 kilograms) in the previous three months, and referred him to a dietitian. (*Id.* at 135-37.) Dr. Kalinjian also noted Plaintiff had an authorization for orthopedic shoes and referred Plaintiff to physical therapy. (*Id.*)

Plaintiff received an MRI on December 27, 2022, and it showed potential discitis or osteomyelitis, a spinal infection. (ECF No. 39-11 at ¶ 8.) Dr. Kalinjian immediately ordered Plaintiff's transfer to the emergency department of an outside hospital for treatment. (*Id.*) He was admitted to the hospital that day, and the next day he received back surgery for "decompression and evacuation of an epidural abscess." (ECF No. 39-23 at 154.) The following day, December 29, 2022, non-defendant Dr. Peña consulted with Plaintiff about pain management, and he noted the spinal infection was "likely secondary to IV drug abuse," opioids in Plaintiff's urine, and "denial of opioid/heroine injection." (*Id.* at 158.) Nonetheless, because opioids are "indicated in the immediate postoperative setting," Dr. Peña recommended them for Plaintiff, and when Plaintiff is "medically and surgically stabilized," a "rapid taper" of the opioids, "persistent use of nonopioid analgesics," and "an interventional/rehabilitative program for drug abuse." (*Id.*)

On January 2, 2023, Plaintiff was prescribed a six-week course of antibiotics. (*Id.* at 168.) He was discharged to "acute rehabilitation" the next day, was weaned off opioids, and other pain medications were increased and adjusted. (*Id.* at 178-84.)

B.   Dr. Singh's Treatment of Plaintiff

According to Plaintiff's medical records and Dr. Singh's declaration, she saw Plaintiff 12

---

[5] Gabapentin is "heavily abused" in the prison system. (ECF No. 39-11 at ¶ 7.)

times at SVSP between May and July 2023, during which period she sent Plaintiff to the hospital six times. (ECF No. 39-1 at ¶¶ 2-4.)

Dr. Singh first saw Plaintiff on May 16, 2023, and due to Plaintiff's "insistence on severe chronic pain" and "to ensure continuity in managing" his pain, she made an exception to general policy and continued his prescription for an opiate (Tylenol-3). (*Id.* at ¶ 3.) After reviewing his recent MRI results, she was concerned about a "possible" return of his spinal infection, so she sent him to NMC on May 24, 2023, and ordered another MRI that was performed on May 31, 2023. (*Id.* at ¶ 5.) At NMC, Plaintiff removed the intravenous line delivering him antibiotics and returned to SVSP against medical advice with complaints about his pain medication. (*Id.*) Because Plaintiff's new MRI showed an abscess, Dr. Singh sent him back to NMC on June 6, 2023. (*Id.* at ¶ 6.) Dr. Singh's notes from that date indicate he had osteomyelitis (i.e. a spinal infection), but in her declaration she states she sent him to the hospital because the "abscess needed to be further examined to determine whether [Plaintiff's] infection had recurred." (*See* ECF No. 68 at 9; ECF No. 39-1 at ¶ 6.) Plaintiff again left NMC against medical advice. (ECF No. 39-1 at ¶ 6.)

Dr. Singh saw Plaintiff again the next day, and referred him back to NMC for a third time on June 8, 2023, based upon the following reasoning:

> [S]ince his recurrence of infection had not yet been ruled out, I believed his condition could be life threatening. My insistence on Smith's hospitalization was for Smith's well-being, despite his reluctance. For Smith's own health and safety, I recommended he be admitted to the hospital. I had previously informed Smith that he would be able to get the appropriate treatment and medication he required at the hospital, which is why I ordered him to be admitted. Though Smith claims I bribed him to go to the hospital with pain medication, I in no way ever bribed Smith to go to the hospital. Before Smith's admission to the hospital, I adjusted Smith's medication and initiated an evaluation with a psychologist, Dr. Rahimi, and a psychiatrist, Dr. Adeyemo, to determine whether Smith had the capacity to make decisions for his own care. This evaluation determined that Smith did have capacity.

(*Id.* at ¶ 7.)

On June 16, 2023, after Plaintiff's return from the hospital, Dr. Singh conducted a substance abuse evaluation of Plaintiff because his medical records noted he had an opiate use

6

disorder. (*Id.* at ¶ 8.) She determined at that time ceasing all opiates was not necessary because Plaintiff indicated that while he used intravenous methamphetamine, he only requested opiates because of his back pain and to improve his mobility. (*Id.*)

On June 19, 2023, Plaintiff refused Dr. Singh's recommendation that he return to the hospital to rule out an infection. (*Id.* at ¶ 9.) After consulting with a neurosurgeon at NMC, on June 27, 2023, Dr. Singh referred Plaintiff to the hospital once again so his spinal condition could be "properly monitored." (*Id.*) Dr. Singh obtained "extra approval" from her supervisor to accommodate his request to be sent to Palmdale Hospital instead of NMC. (*Id.*) However, once there, Plaintiff again refused treatment — a recommended "needle aspiration" and antibiotics — and returned to prison the next day. (*Id.*)

On June 29, 2023, Plaintiff complained of worsening back pain, swelling, and inability to urinate, so Dr. Singh sent him to the hospital (NMC) for a fifth time on an emergency basis. (*Id.* at ¶ 10.) At NMC, the doctors found no immediate need for surgery, Plaintiff refused antibiotics, and he ultimately returned to prison on July 6, 2023, against medical advice. (*Id.*) On July 7, he was aspirated and tested negative for osteomyelitis. (ECF No. 39-23 at 350-51.)

The next day, Dr. Singh addressed Plaintiff's continuing complaints of back pain by prescribing NSAIDs, gabapentin, Tylenol-3, and morphine, based upon the following reasoning:

> Due to the potentially emergent nature of Smith's spinal condition and urinary abilities, and because Smith claimed his pain would keep him from being able to be transported to the hospital, my analysis concluded that it was still in Smith's best interests to receive morphine and opioids to ensure he could be transported to the hospital if necessary. This decision balanced the need to manage Smith's pain and his spinal condition, and required me to weigh the risk of dependency on stronger narcotics given Smith's long history of various substance abuse that is documented in his medical records.

(ECF No. 39-1 at ¶ 11.)

Dr. Singh sent Plaintiff back to NMC for a sixth time on July 14, 2023, for his complaints of back pain, nausea, vomiting, diarrhea, and loss of appetite. (*Id.* at ¶ 12.) At NMC, he refused antibiotics again, and doctors determined he was engaging in "pain-medication-seeking behavior by demanding Dilaudid, a much stronger opioid pain medicine than morphine." (*Id.*) Plaintiff

7

again left the hospital against medical advice, and Dr. Singh saw him for a final time on July 17, 2023. (*Id.*) She discontinued his morphine because the "negative effects from using the drug, including the risk of him abusing it, outweighed the benefits of pain relief due to his nausea symptoms." (*Id.*)

Plaintiff was subsequently transferred to another prison and treated at an outside hospital. (*Id.* at ¶ 13.) Medical records show that while there, he remained "on almost the same exact regimen . . . with less pain medication" as that prescribed by Dr. Singh. (*Id.*)

### c. Additional Evidence

In March 2022, prior to seeing Defendants, Plaintiff was treated at CSP-SAC for substance abuse disorder, including an abscess on his arm from intravenous drug use. (ECF No. 39-23 at 11.) Plaintiff told the doctor he was self-medicating for pain, declined medication to treat substance use disorder, and refused to have the abscess drained. (*Id.* at 13.)

Defendants also present the opinion of a medical doctor as an expert on the reasonable standard of medical care. The expert reviewed Plaintiff's medical records and concluded Defendants' course of treatment was medically acceptable under the circumstances. (ECF No. 39-21 at ¶¶ 106, 112.)

### III. Plaintiff's Evidence in Opposition

In opposition to Defendants' motion, Plaintiff submits two sworn declarations and two sworn statements of disputed facts, along with some of his medical records as exhibits. (ECF Nos. 67-70.)

With respect to Dr. Kalinjian, Plaintiff states Dr. Kalinjian "saw" him "a total of three times" between October 15 and December 27, 2022, when he was sent to the outside hospital for emergency surgery due to an abscess in his spine. (ECF No. 69 at ¶ 1.) Plaintiff states the neurosurgeon, Dr. Carson, said the abscess was the cause of his impaired leg function and loss of 61 pounds. (*Id.* at ¶ 2.) Plaintiff also states that on October 15, 2022, Dr. Kalinjian told him, "he could not find the MRI from Methodist Hospital of October 12, 2022, which reported an MRI may be useful for a full evaluation, and there is moderate L5-S1 spoadylosis with degenerative

changes."[6] (*Id.* at ¶ 3.) The doctor's notes from that date, however, indicate Plaintiff received a CT scan and report, "Moderate L5-S1 spondylosis with facet degenerative changes. There is no spondylolisthesis." (ECF No. 68 at 22.) These notes further state: "Ultrasound should be considered for initial follow-up, however MRI may be useful for full evaluation." (*Id.*) On October 15, 2022, according to Plaintiff, Dr. Kalinjian also "accused me of faking my pain [and] not being able to walk, and ignored my weight los[s]," and Plaintiff called him a "Dumbass." (ECF No. 69 at ¶ 4.)

With respect to his care by Dr. Singh, Plaintiff states he left the hospital on June 6, 2023, because he was "poked too many times." (ECF No. 68 at 9.) Plaintiff asserts that on May 30, June 22-23, and July 7, Dr. Singh "knew" that his "spinal infection had returned." (ECF No. 68 at 3:5-8.) He explains that "all of his refusals" of medical care "were for being poked too many times for an IV line." (*Id.* at 4:9-13; *see also id.* at 3:13-17, ECF No. 70 at 3:3-7.)[7] He also denies engaging in pain-medication-seeking behavior at NMC, and asserts doctors there (Defendants Dr. Berman and Dr. Dougherty) said this only after he complained about them. (*Id.* at 4:21-5:3.) Plaintiff further states he had "lower back pain" since 2014, but "prison medical staff" told him it was "normal wear and tear or plaintiff was drug seeking." (*Id.* at 5:9-14.)

**DISCUSSION**

A.  Standard of Review

Summary judgment is proper when the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

---

[6] Plaintiff cites "Exhibit E, verified complaint." (ECF No. 69 at ¶ 1.) Neither the original nor amended complaints have an Exhibit E (*see* ECF No. 1 at 4-14; ECF No. 15-1), so the Court construes this as a reference to Exhibit E attached to one of his oppositions (ECF No. 68 at 19-37). Neither this exhibit nor any of the medical records submitted by the parties show he received an MRI from Methodist Hospital, however.

[7] According to Plaintiff's medical records, in some instances, he removed his I.V. line and/or left the hospital against medical advice because he did not receive the pain medications he wanted. (*See*, *e.g.*, ECF No. 68 at 11, 18.)

9

nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp.v. Cattrett*, 477 U.S. 317, 323 (1986). When the moving party has met this burden of production, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing there is a genuine issue for trial. *Id.* at 324. If the nonmoving party fails to produce enough evidence to show a genuine issue of material fact, the moving party wins. *Id.* at 323.

At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 570 U.S. 650, 656-57 (2014). If more than one reasonable inference can be drawn from undisputed facts, the trial court must credit the inference in favor of the nonmoving party. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

B. <u>Analysis</u>

1. <u>Eighth Amendment Standard</u>

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on such a claim, a prisoner-plaintiff must show a "serious medical need," and that the defendants' "response to the need was deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

Defendants concede Plaintiff's back condition was "serious" within the meaning of the Eighth Amendment (*see* ECF No. 39 at 19:1), but they argue there is no triable issue that they were deliberately indifferent to his condition. A prison official is deliberately indifferent if the official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). An official is liable if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. So, for deliberate indifference to be established, there must be a purposeful act or failure to act on the part

10

of the defendant and resulting harm. *Simmons v. G. Arnett*, 47 F.4th 927, 933 (9th Cir. 2022). "Under this standard, an inadvertent failure to provide adequate medical care, differences of opinion in medical treatment, and harmless delays in treatment are not enough to sustain an Eighth Amendment claim." *Id.* at 934. Neither does a claim of medical malpractice or negligence. *See Toguchi v. Chung,* 391 F.3d 1051, 1060 (9th Cir. 2004).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a "mere difference of medical opinion" among medical professionals as to the need to pursue one course of treatment over another does not raise a "material question of fact" regarding the issue of deliberate indifference. *Toguchi*, 391 F.3d at 1058; *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was medically unacceptable under the circumstances, and was chosen in conscious disregard of an excessive risk to [the prisoner's] health." *Toguchi*, 391 F.3d at 1058 (citation and internal quotations omitted).

2. Dr. Kalinjian

Viewing the evidence in a light most favorable to Plaintiff, no reasonable fact-finder could conclude Dr. Kalinjian was deliberately indifferent to Plaintiff's back pain, swallowing a razor blade, and weight loss.[8] There is no reasonable dispute as to what medical care Dr. Kalinjian provided.

With respect to Plaintiff's back condition, the record does not support a reasonable inference Dr. Kalinjian acted in "disregard[] of an excessive risk to Plaintiff's health. *Farmer*, 511 U.S. at 837. When he first met with Plaintiff, Dr. Kalinjian reviewed Plaintiff's prior medical records, including the doctor's notes and Plaintiff's test results. He examined Plaintiff on multiple occasions, and prescribed him a host of pain medications, including diclofenac, lidocaine, Tylenol, Cymbalta, and amitriptyline. Plaintiff does not dispute the evidence that he reported the

---

[8] Plaintiff's pleadings and opposition papers do not assert he received inadequate medical care for any other medical condition.

11

diclofenac was effective in treating his back pain. While Plaintiff also wanted to receive opioid medication, Dr. Kalinjian and Defendants' medical expert agree that opioids were not medically indicated at that time and presented their own serious risk of harm to Plaintiff in light of his history of substance abuse. Dr. Kalinjian also ordered the ultrasound recommended by Plaintiff's prior doctor at their first appointment, later ordered a CT scan, and ordered an MRI once Plaintiff became eligible after his discharge from suicide watch. Plaintiff does not dispute the evidence Dr. Kalinjian immediately referred him to a neurosurgeon based upon those MRI results, or that he had previously offered Plaintiff a spinal injection or surgery, referred to him to physical therapy, and granted his request for a permanent wheelchair. The medical expert opined these steps constitute medically acceptable treatments for Plaintiff's back under the circumstances. Plaintiff's disagreement with the medical opinions of this expert and Dr. Kalinjian "does not give rise to a § 1983 claim." *Franklin*, 662 F.2d at 1344.

In addition, no reasonable fact-finder could conclude from the record Dr. Kalinjian purposefully failed to take reasonable steps to address Plaintiff having swallowed a razor blade and his weight loss. *See Simmons*, 47 F.4th at 933-34. There is no dispute that when Plaintiff told Dr. Kalinjian about the razor blade, Dr. Kalinjian immediately ordered an abdominal x-ray and referred Plaintiff to the Emergency Department.[9] With respect to his weight loss, Plaintiff asserts he told Dr. Kalinjian in November 2022 that he lost 61 pounds in three weeks. Even assuming Plaintiff told Dr. Kalinjian he lost that much weight,[10] that alleged fact is not sufficient to support a reasonable inference Dr. Kalinjian both *knew* Plaintiff had lost that much weight, and, if he did, that he disregarded it. It is undisputed that on December 14, 2022, Dr. Kalinjian calculated from Plaintiff's medical records that Plaintiff had lost approximately 30 pounds since September 2022. It is undisputed, moreover, that as a result of that finding, Dr. Kilinjian referred Plaintiff to a dietitian. There is no evidence that any additional steps to address Plaintiff's weight loss were medically necessary. No reasonable fact-finder could conclude from the evidence in the record

---

[9] There is also no dispute Plaintiff was subsequently treated for suicidal ideation.
[10] The medical records submitted by the parties do not indicate Dr. Kalinjian saw or spoke to Plaintiff in November 2022; rather, these records show other (non-defendant) doctors saw Plaintiff that month, on November 22, 23, and 29, 2022. (ECF No. 39-23 at 112-20.)

that Dr. Kalinjian purposefully failed to take reasonable steps to address Plaintiff's swallowing a razor blade and weight loss.

Plaintiff complains that when he first saw Dr. Kalinjian in October 2022, Dr. Kalinjian failed to review Plaintiff's MRI results from his October 12, 2022 visit to the Emergency Department at Methodist Hospital. It is undisputed that when Plaintiff told Dr. Kalinjian he had had an MRI on October 12, 2022, Dr. Kalinjian looked in his medical records but could not find any indication Plaintiff had an MRI on that date. Plaintiff's medical records show only that he had a CT scan on that date, and the only reference to an MRI was the Emergency Department doctor's opining that "an MRI may be useful for a full evaluation" and recommending an "initial follow-up" with an ultrasound. (ECF No. 68 at 22.) Neither this report, nor anything else in this record, reasonably supports a finding Plaintiff had an MRI on October 12, 2022, and Plaintiff, as a lay witness, is not qualified to create a triable dispute of fact by opining that the test he received was an MRI and not a CT scan. Moreover, there is no dispute Dr. Kalinjian ordered an ultrasound and later an MRI. No reasonable fact-finder could conclude from the record Dr. Kalinjian disregarded a risk to Plaintiff's health by failing to review Plaintiff's MRI results.

Plaintiff complains in an opposing declaration that Dr. Kalinjian "saw" him "a total of three times" between October 15 and December 27, 2022. (ECF No. 69 at ¶ 1.) Plaintiff's medical records show Dr. Kalinjian treated Plaintiff five times during that period: on October 19, 20, and 27, and December 14 and 27, 2022, (ECF No. 39-23 at 85-87, 97-99, 106-110, 135-38, 141-43), and Dr. Kalinjian states he also consulted by telephone with the doctor in charge of Plaintiff's care on November 24, 2022 (ECF No. 39-11 ¶ 6). Even assuming Plaintiff's testimony that Dr. Kalinjian saw him three times during this period, it is insufficient to support a reasonable inference based upon the record that Dr. Kalinjian deliberately disregarded an excessive risk to Plaintiff's health. The record has no evidence, nor does Plaintiff argue, Dr. Kalinjian ever denied Plaintiff or otherwise deliberately disregarded a request from him for an appointment or examination. In addition, Plaintiff does not dispute the medical records showing that between October and December 2022, Plaintiff received medical treatment from a host of other medical professionals, include doctors, a psychiatrist, a physical therapist, a dietitian, and a social worker.

13

1  Moreover, the testimony of the witnesses qualified to render a medical opinion on the matter—the
2  expert (Dr. Feinberg) and Dr. Kalinjian himself—is that Dr. Kalinjian took medically appropriate
3  steps to treat Plaintiff under the circumstances.  There is no evidence in the record from which a
4  rational fact-finder could infer Plaintiff's medical condition worsened because Dr. Kalinjian "saw"
5  him three times, or conversely that it would have improved from seeing him more times.  Thus,
6  even assuming true that Dr. Kalinjian saw Plaintiff only three times between October and
7  November 2022, the record does not support a reasonable determination Dr. Kalinjian was
8  deliberately indifferent to Plaintiff's medical needs.

9  Plaintiff also complains Dr. Kalinjian wrongfully accused him of faking not being able to
10  walk.  Even if true, the record does not support a reasonable finding Dr. Kalinjian disregarded
11  Plaintiff's mobility needs insofar as Plaintiff does not dispute that Dr. Kalinjian ordered Plaintiff's
12  wheelchair continue on a permanent basis.

13  The Court concludes there is no triable factual dispute, if resolved in Plaintiff's favor, that
14  reasonably supports a determination that Dr. Kalinjian was deliberately indifferent to his serious
15  medical needs.  Consequently, Dr. Kalinjian is entitled to summary judgment.

16      3. <u>Dr. Singh</u>

17  The evidence, when viewed in a light most favorable to Plaintiff, also does not reasonably
18  support a determination that Dr. Singh was deliberately indifferent to Plaintiff's back condition.[11]
19  The care Dr. Singh provided is not in dispute. Between May and July 2023, when Plaintiff was
20  under her care, Dr. Singh saw him 12 times, both in response to his requests for care and to follow
21  up when he returned from hospital visits.  For his pain, she prescribed medications including
22  NSAIDs, gabapentin, Tylenol-3, and morphine.  To address any spinal infection, she prescribed
23  antibiotics and sent him to the hospital six times for testing and further treatment, on one occasion
24  securing a special accommodation at Plaintiff's request to be transported to the more distant
25  Palmdale Hospital.  In addition, she reviewed his prior medical records, ordered a psychological
26  evaluation, consulted with a neurosurgeon, and performed a substance abuse evaluation.  The

---

[11] Plaintiff does not assert Dr. Singh was deliberately indifferent to any other medical condition.

medical expert agrees that these measures were medically acceptable and met the standard of reasonable care for Plaintiff's medical needs. No reasonable fact-finder could conclude from this undisputed record of extensive and accommodative medical care by Dr. Singh that she acted in "disregard of an excessive risk" to Plaintiff's health. *Farmer*, 511 U.S. at 837.

Plaintiff complains that when he first visited Dr. Singh, she reduced his dosage of Tylenol with codeine from three times per day to two per day, but the evidence does not support a reasonable inference such a reduction disregarded an "excessive risk" to his health or presented a "substantial risk of harm" to him. *See id.* The evidence is undisputed Dr. Singh had reviewed his medical records, including his test results, his medications, and prior doctors' notes, weighed the health risks of opioids in light of Plaintiff's history of substance abuse, and determined the modified amount of Tylenol-3 along with additional pain medications was medically appropriate approximately three months after surgery. The medical expert agreed this determination was medically appropriate. As Plaintiff's pain persisted, Dr. Singh continued his pain medications, including opioids Tylenol-3 and morphine, after evaluating him for substance abuse and securing a psychological evaluation. At most, the record reflects Plaintiff merely disagrees with Dr. Singh's opinion as to how to treat his pain, which disagreement "does not give rise to a § 1983 claim." *Franklin*, 662 F.2d at 1344.

Plaintiff complains further that on May 30, June 22-23, and July 7, Dr. Singh "knew" that Plaintiff's "spinal infection had returned." (ECF No. 68 at 3:5-8.) Reasonable inferences can be drawn from the record either that Dr. Singh thought he had an infection or simply suspected one: she states in her declaration that she ordered Plaintiff's hospitalizations for a determination of whether he had an infection (ECF No. 39-1 at ¶¶ 5-7), while her notes state he had osteomyelitis (*see*, *e.g.*, ECF No. 68 at 9). Plaintiff tested negative for an infection on July 7, 2023, and the record does not contain any other test for an infection during the time period he was under Dr. Singh's care. (ECF No. 39-23 at 350-51.) Even if the evidence is construed to permit a reasonable finding that Plaintiff's spinal infection had recurred while he was under Dr. Singh's care, the record does not support a reasonable determination Dr. Singh failed to provide medically appropriate treatment for such an infection. She repeatedly ordered him to the hospital (over his

15

objections for evaluation), for administration of intravenous antibiotics, and possible surgery; advised him of the seriousness of such a condition, and the importance to his health of treatment; and consulted with experts, including hospital doctors, a neurosurgeon, and mental health professionals. The record is undisputed Plaintiff left the hospital—-where he could receive antibiotics, pain medication, testing, monitoring, and any necessary surgery—against medical advice each of the six times Dr. Singh sent him there. Consequently, to whatever extent Plaintiff's medical condition worsened between May and July 2023 while under Dr. Singh's care, the record does not support a reasonable inference that was the result of Dr. Singh's purposeful actions or inactions, as opposed to Plaintiff's own conduct, the nature of his condition, or some other cause.[12]

The Court concludes there is no triable factual dispute, if resolved in Plaintiff's favor, that reasonably supports a determination that Dr. Singh was deliberately indifferent to his serious medical needs. Consequently, she is entitled to summary judgment.

4. Plaintiff's Declaration

Along with his opposition papers, Plaintiff submitted a declaration (ECF No. 67) in which he asserts facts "exist but cannot be present[ed]" because the Court erred in denying his motion for production of documents from nonparties CSP-LAC and the Warden of Donovon Correctional Facility ("DCF"). (ECF No. 67 at 1.) Plaintiff does not identify the facts that purportedly "exist" which he could not present, nor does he explain how any such facts are relevant to the issues raised in the instant motion.

Moreover, his arguments the Court erred in denying his motion are not persuasive. In denying the motion, the Court explained that because CSP-LAC[13] and the DCF Warden are "are not parties to this lawsuit . . . the Court cannot compel them to produce documents under Rule 37 of the Federal Rules of Civil Procedure." (*Id.* at 2:8-10.)[14] First, Plaintiff argues that CSP-LAC

---

[12] Even assuming the truth of Plaintiff's claims he left the hospital because was "poked too many times" during attempts to give him antibiotics intravenously (ECF No. 68 at 2:23-24), there is no evidence supporting a reasonable inference either that Dr. Singh was involved in or responsible for those procedures, or that being "poked too many times" meant he had to leave the hospital altogether and forego testing, monitoring, medications, and any necessary surgery.
[13] CSP-LAC is a facility that is part of the CDCR, not an independent government entity that can be sued.
[14] The Court also reminded Plaintiff:

16

and the DCF Warden are parties, but they are not listed as parties in the operative complaint. (*See* ECF No. 15 at 2.) Plaintiff also states he requested his medical records from CSP-LAC but received no response. He has not shown he complied with prison procedures for requesting review of his medical record because he does not provide any evidence of such requests or indicate how or to whom he made them. The Court notes Defendants served him 371 pages of his medical records related to his claims as exhibits to the instant motion, including records covering all of his visits with Dr. Kalinjian at CSP-LAC (*see* ECF No. 39-23), and he does not indicate what additional records he did not receive or how such records might be relevant to his claims against Defendants.

Lastly, Plaintiff argues Defendants failed to include a separate statement of undisputed facts. Such a statement was not ordered and therefore not allowed, *see* Civ. L.R. 56-2(a).

Accordingly, Plaintiff's declaration does not alter the conclusion Defendants are entitled to summary judgment.

## CONCLUSION

For the above reasons, the motion for summary judgment by Defendants Dr. Kalinjian and Dr. Singh is GRANTED. Plaintiff has filed a motion for appointment of counsel to represent him at any upcoming court dates. (ECF No. 76.) In light of the Court's ruling, there are no upcoming court dates, and the motion for appointment of counsel is DENIED.

The Clerk shall enter judgment and close the file.

This order resolves docket numbers 39 and 76.

**IT IS SO ORDERED.**

Dated:

---

As for obtaining copies of his medical records, Plaintiff was advised previously and is advised again: Plaintiff is reminded that state prisoners inmates may review all non-confidential material in their medical and central files, pursuant to *In re Olson*, 37 Cal. App. 3d 783 (Cal. Ct. App. 1974); 15 California Code of Regulations § 3370; and the CDCR's Department Operations Manual §§ 13030.4, 13030.16, 13030.16.113030.16.3, 13030.21, and 71010.11.1. Requests to review these files or for copies of materials in them must be made directly to prison officials, not to the court.
(ECF No. 8 at 6:7-12 (emphasis added)).

17

Dated: June 9, 2025

JACQUELINE SCOTT CORLEY
United States District Judge